FILED
2013 Jul-03  PM 02:41
U.S. DISTRICT COURT
N.D. OF ALABAMA

## IN THE UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | | |
|---|---|---|
| **PHYLLIS LOUISE PURSER**, | ) | |
| | ) | |
| **Plaintiff** | ) | |
| | ) | |
| | ) | |
| **v.** | ) | **CIVIL ACTION NO. 2:11-cv-03800-KOB** |
| | ) | |
| **MICHAEL J. ASTRUE**, | ) | |
| **Commissioner of the Social**, | ) | |
| **Security Administration** | ) | |
| | ) | |
| **Defendant.** | ) | |

## MEMORANDUM OPINION

## I. INTRODUCTION

On June 18, 2009, the claimant, Phyllis Louise Purser, applied for supplemental security income under Title XVI of the Social Security Act. The claimant alleged disability beginning on June 18, 2009. (R. 17). The claimant alleged she is unable to work because of back problems and early onset emphysema. The Commissioner denied her claim on October 5, 2009. (R. 57). The claimant filed a timely request for hearing before an Administrative Law Judge, and the ALJ held a video hearing on March 2, 2011. The claimant appeared in Gadsden, Alabama, and the ALJ presided from Birmingham, Alabama. (R. 17). The ALJ issued a decision finding the claimant not disabled on March 18, 2011. (R. 25). The Appeals Council denied the claimant's request for review on September 1, 2011; consequently, the ALJ's decision became the final decision of the Commissioner of the Social Security Administration. (R. 1). The claimant has exhausted her administrative remedies, and this court has jurisdiction pursuant to 42 U.S.C. §§ 405(g) and 1631(c)(3). For the reasons stated below, this court reverses and remands the decision of the Commissioner.

## II. ISSUE PRESENTED

The following issue is before the court: whether the Appeals Council erred in refusing to review the ALJ's decision by inadequately considering Dr. Harper's Physical Capacities Evaluation that the claimant submitted to the Appeals Council after the ALJ's decision.

## III. STANDARD OF REVIEW

The standard of review of the Commissioner's decision is a limited one. This court must find the Commissioner's decision conclusive if it is supported by substantial evidence. 42 U.S.C. § 405(g); *Graham v. Apfel*, 129 F.3d 1420, 1422 (11th Cir. 1997). "Substantial evidence is more than a scintilla, but less than a preponderance. It is such relevant evidence as a reasonable person would accept as adequate to support a conclusion." *Richardson v. Perales*, 401 U.S. 389, 401 (1971). A reviewing court may not look only to those parts of the record that support the decision of the ALJ, but instead must view the record in its entirety and take account of evidence that detracts from the evidence relied on by the ALJ. *Hillsman v. Bowen*, 804 F.2d 1179 (11th Cir. 1986).

> [The court must] . . . scrutinize the record in its entirety to determine the reasonableness of the [Commissioner's] . . . factual findings . . . No similar presumption of validity attaches to the [Commissioner's] . . . legal conclusions, including determination of the proper standards to be applied in evaluating claims.

*Walker v. Bowen*, 826 F.2d 996, 999 (11th Cir. 1987).

## IV. LEGAL STANDARD

Under 42 U.S.C. § 423(d)(1)(A), a person is entitled to disability benefits when the person is unable to "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months . . . . To make this

determination the Commissioner employs a five-step, sequential evaluation process." 20 C.F.R.

§§ 404.1520, 416.920.

> (1) Is the person presently unemployed?
> (2) Is the person's impairment severe?
> (3) Does the person's impairment meet or equal one of the specific
> impairments set forth in 20 C.F.R. Pt. 404, Subpt. P, App. 1?
> (4) Is the person unable to perform his or her former occupation?
> (5) Is the person unable to perform any other work within the economy?
>
> An affirmative answer to any of the above questions leads either to the next
> question, or, on steps three and five, to a finding of disability. A negative
> answer to any question, other than step three, leads to a determination of "not
> disabled."

*McDaniel v. Bowen*, 800 F.2d 1026, 1030 (11th Cir. 1986).

Though the Appeals Council has discretion not to review the ALJ's decision to deny

benefits, the Appeals Council must consider any new and material evidence submitted after the

ALJ's decision when it decides whether to review an ALJ's decision. 20 C.F.R. §§ 404.967,

404.970(b), 416.1470(b), 416.1467; *Falge v. Apfel*, 150 F.3d 1320, 1323 (11th Cir. 1998). The

Eleventh Circuit held that "a federal district court must consider evidence not submitted to the

administrative law judge but considered by the Appeals Council when that court reviews the

Commissioner's final decision denying Social Security benefits." *Ingram v. Commissioner of

the Social Security Administration*, 496 F.3d 1253, 1258 (11th Cir. 2007). To be entitled to a

remand to the Social Security Administration for consideration of newly discovered evidence

under the fourth sentence of section 405(g), the claimant must show that (1) new, non-

cumulative evidence exists, (2) the evidence is material such that a reasonable possibility exists

that the new evidence would change the administrative result, and (3) good cause exists for the

applicant's failure to submit evidence at the appropriate administrative level. *Vega v. Comm'r of

Soc. Sec.*, 265 F.3d 1214, 1218 (11th Cir. 2001).

New evidence that was not contained in the administrative record is non-cumulative.

*Cannon v. Bowen*, 858 F.2d 1541, 1546 (11th Cir. 1988) (finding that a treating physician's opinion of total disability and a vocational expert's report were new evidence not in the record); *see also Milano v. Bowen*, 809 F.2d 763, 766 (11th Cir. 1987) (finding that the only comprehensive psychological evaluation of the claimant's condition constituted new evidence). However, new evidence must relate to the time period on or before the date of the ALJ's decision. 20 C.F.R. §§ 404.970(b), 416.1470(b).

New evidence is material if a reasonable possibility exists that the new evidence would change the administrative result. *Falge*, 150 F.3d at 1323. The good cause requirement is satisfied when the evidence did not exist at the time of the administrative proceedings. *Cannon*, 858 F.2d at 1546. However, when the claimant could have obtained the evidence earlier, the good cause requirement is not satisfied. *Cf. Falge*, 150 F.3d at 1323 n.8 (noting that although the physician's report was prepared after the ALJ's hearing, the opinions set out in the report appeared to have been based on medical examinations and tests conducted before the ALJ rendered his decision).

Regardless of when it is received, a treating physician's report may be discounted when it is not accompanied by objective medical evidence or is wholly conclusory. *Crawford v. Comm'r of Soc. Sec.*, 363 F.3d 1155, 1159 (11th Cir. 2004); *Edwards v. Sullivan*, 937 F.2d 580, 583 (11th Cir. 1991). The Commissioner also may reject any medical opinion if the evidence supports a contrary finding. *Syrock v. Heckler*, 764 F.2d 834, 835 (11th Cir. 1985).

### V. FACTS

The claimant was forty-six years old at the time of her hearing. She has a sixth grade level of education and no GED. (R. 40). Her only prior work experience is a part-time job running the dry press at a dry cleaning business. The claimant filed for supplemental security income alleging that she could not work because of back problems and early onset emphysema.

(R. 117-18). On appeal, the claimant contends that she is disabled because of back pain and that the ALJ's denial of benefits was not based on substantial evidence. (R. 11-14). The claimant also contends that the Appeals Council failed to adequately review the additional evidence she submitted after the ALJ's decision, namely the evaluations performed by Dr. Harper. (R. 7-8).

*Physical Limitations*

On January 31, 2005, the claimant went to the emergency room at Carraway Methodist Medical Center seeking treatment for injuries from a motor vehicle accident. (R. 211-29). The claimant indicated that she injured her neck, right shoulder, right arm, and right hand and that she bruised her left hip in the accident. (R. 226). The attending physician, Dr. Adam Ross Nortick, took numerous X-rays and indicated that "there is straightening of the lordosis which could be due to spasm or strain." (R. 215). The doctor noted a previous fusion at L4-5. Dr. Nortick also found mild bony foraminal encroachment in the claimant's neck. During the evaluation, the doctor noted that the claimant had a limited range of motion in her wrist. Dr. Nortick applied a short splint to the claimant's right arm. (R. 225-29).

On February 12, 2006, the claimant went to the emergency room at Walker Baptist Medical Center seeking treatment for lower back pain. (R. 317). During this visit, the claimant classified her pain as "sharp, moderate pain" that was exacerbated by movement. (R. 312). Attending physician, Dr. Timothy D. Lovely, diagnosed the claimant with an acute myofascial strain of the lumbar region due to lumbago and overexertion/strenuous movement. (R. 318, 326). Dr. Lovely prescribed Toradol for pain relief and discharged the claimant the same day. (R. 322).

On June 26, 2006, the claimant went to the emergency room at Walker Baptist Medical Center seeking treatment for lower back pain. (R. 327). The attending physician, Dr. Nigel E. Palmer, diagnosed the claimant with acute myofascial strain to the lumbar region, sciatica,

5

lumbago, pain in her limbs, and tobacco use disorder. (R. 328; 336).  The doctor treated the claimant with Toradol and Norflex and wrote her a prescription for Flexeril, Midol Back, and Lortab. Dr. Palmer also instructed the patient to take three days off work to rest.  Dr. Palmer discharged the claimant on the same day. (R. 331-33).

On March 7, 2007, the claimant went to the emergency room at Physician's Medical Center seeking treatment for lower back pain. (R. 192-201). Attending physician, Dr. Sanji Chatterji, diagnosed the claimant with chronic back pain. (R. 199).  The doctor recommended that the claimant rest and follow up with Dr. Robert Craddock, a neurosurgeon. Dr. Chatterji prescribed Robaxin and Vicoprofen for pain relief. (R. 194-95).

On October 9, 2007, the claimant went to the emergency room at Physician's Medical Center seeking treatment for shortness of breath and chest pain. The attending physician, Dr. Minh Huynh, diagnosed the claimant with asthma and bronchitis. (R. 179-191). Dr. Huynh prescribed several medications, including Albuterol and Robitussin,[1] and discharged the claimant on the same day. (R. 191).

On March 27, 2008, the claimant went to the emergency room at Physician's Medical Center seeking treatment for shortness of breath, a cough, and a headache. (R.170-78). The attending physician, Dr. Bobby R. Lewis, noted that another doctor saw the claimant the week before in Oneonta for the same complaints and prescribed Amoxicillin and Endal HD.[2] (R. 171). Dr. Lewis took an X-ray and diagnosed the claimant with bronchitis. (R. 177-78). Dr. Lewis treated the claimant with Toradol. Upon discharge, Dr. Lewis prescribed Combivent and Endal HD and instructed the claimant to continue taking Amoxicillin and Endal HD. (R. 173-75).

[1]Dr. Huynh prescribed two other medications, but the prescriptions are illegible.

[2]The record contains no evidence of this visit and does not indicate who the claimant saw in Oneonta.

On September 17, 2008, the claimant went to the emergency room at Walker Baptist Medical Center seeking treatment for a cough. (R. 305-316). The physician on duty, Dr. Willie L. Gilford, diagnosed the cough as acute asthmatic bronchitis. (R. 306). Dr. Gilford prescribed Albuterol and Phenergan Codeine. (R. 310). Dr. Gilford also ordered an X-ray of the claimant's chest. The X-ray revealed a subtle opacity projected over the medial margin of the posterior right seventh rib and a slight blunting of a posterior sulcus on the lateral film. The X-ray did not reveal a large pleural effusion or convincing evidence of consolidation. The diagnostic radiologist, Dr. Kenneth Jeff Hager, indicated that the subtle opacity projected over the medial right upper lung might represent superimposition of bone and vessel and recommended following up with chest radiographs in 2-4 weeks. (R. 315).

On August 17, 2009, the claimant went to the emergency room at Walker Baptist Medical Center seeking treatment for pain in her lower back. (R. 296-304). The Physician Record[3] indicates that the claimant injured her back by "stepp[ing] down wrong" and falling. The Physician Record also indicates that the claimant's pain is dull, made worse by movement, and made better by remaining still. The Physician Record further indicates that the claimant was having difficulty walking and had a mildly decreased range of motion. (R. 296-97). The attending physician treated the claimant with Toradol and Norflex, and prescribed Percocet, Flexeril, Medrol, and Naproxen. (R. 301).

On September 16, 2009, the claimant saw Dr. Rodolfo Monedera Veluz for a Consultative Examination Report at the request of the Disability Determination Service. (R. 238-245). Dr. Veluz determined that the claimant suffered from hypertension, chronic

---

[3]The doctor's signature in the record appears to be "James L. Ray" or "Jeremy J. Rog." A Dr. James L. Ray practices in Georgia, but no record of him working at Walker Baptist Medical Center exists.  A Jeremy S. Rogers currently works at Walker Baptist Medical.

bronchitis, thyroid disease, depression, and suicidal thoughts in the past. Dr. Veluz also stated

that, despite undergoing lumbar surgery in 1996, the claimant cannot sit or stand for longer than

five minutes and cannot walk further than sixty feet because of the ruptured discs in the

claimant's lower back. During the examination, Dr. Veluz noted that the claimant also was

unable to squat or heel/toe walk, but was able to get on and off the examination table without

problems. (R. 239-41). Upon examination, Dr. Veluz indicated that the claimant had limited

range of motion. In particular, Dr. Veluz indicated that the claimant had less than five degrees of

lateral flexion on either side, roughly ten degrees of backward extension from the hips, and

refused to extend her back. (R. 243-45).

Dr. Veluz noted that a laminectomy had been performed on L5-S1 using intervertebral

fusion and short segment stabilization with a transpendicular screw and rod system. Dr. Veluz

observed that the hardware was in satisfactory position and no hardware fracture was

demonstrated. He also indicated that solid intervertebral bony union was present. Based on these

observations, Dr. Veluz determined that the alignment was normal and that mild disco vertebral

joint degenerative change was present at L1-2, L2-3, and L3-4, with a mild loss of disc height

and ventral osteophytic lipping. Dr. Veluz determined that bone and joint appearances elsewhere

were normal. (R. 245).

Based on the above observations, Dr. Veluz concluded that the claimant suffers from

chronic low back pain status post lumbar laminectomy, status post bilateral thyroidectomy,

hypertension, anxiety, and depression with thoughts of suicide in the past. (R. 242).

On October 5, 2009, Patti Hood conducted a Physical Residual Functional Capacity

(RFC) assessment on the claimant.[4] (R. 260-67). This evaluation determined that the claimant

_____

[4]The record does not indicate who requested the RFC assessment.

could occasionally lift twenty pounds and frequently lift ten pounds. The assessment also indicated that the claimant could sit for six hours during an eight hour work day. The RFC found that the claimant could push and/or pull without additional limits other than the limits for lift and/or carry. Ms. Hood noted that the claimant had a "1+ spasm in neck," but that the claimant's range of motion was within normal limits. Ms. Hood also indicated that the claimant was unable to squat or heal-toe walk, but was able to get on and off the exam table without problems. Ms. Hood recommended that the claimant should not work around hazardous machinery and should avoid unprotected heights and concentrated exposure to extreme cold. (R. 261-264).

On October 5, 2009, Dr. Robert Estock conducted a Psychiatric Review Technique on the claimant. (R. 246-259). Dr. Estock noted that the claimant took care of her children, had no problems with personal care, and cooked with her daughter every day. Dr. Estock also noted that the claimant plays with her grandchildren and shops regularly. The claimant also told Dr. Estock that the claimant can pay attention for a long time, usually finishes what she starts, follows instructions well, and gets along with authority figures. Based on these statements, Dr. Estock determined that the claimant's mental limitations were not severe. In his analysis, Dr. Estock stated that the claimant's statements about her condition should be considered partially credible. (R. 258).

On February 25, 2010, the claimant went to the emergency room at Walker Baptist Medical Center seeking treatment for pain in her shoulders. The attending physician, Dr. Scott T. Kelley, noted that the claimant's pain was moderate to severe and ordered X-rays of the claimant's shoulders. (R. 282; 294-95). The X-ray of the left shoulder revealed that the AC joint was within normal limits; showed a separation of 4mm; and indicated that the clavicle and scapula were normal. The X-ray of the right shoulder revealed that the glenohumeral alignment

9

was satisfactory, articular surfaces were smooth, and that the AC joint showed a slight separation of approximately 6mm. The diagnostic radiologist, Dr. Davor A. Luketic, reported that the separation of the right shoulder could indicate a ligamentous injury and recommended a "weight-bearing view" X-ray. (R. 294-95).

On March 6, 2010, the claimant went to the emergency room at Walker Baptist Medical Center seeking treatment for neck and back pain. (R. 270-72). The claimant described her pain as burning, sharp, and exacerbated by movement. The attending physician, Dr. Scott Kelley, diagnosed the claimant with cervical myofascial strain and cervical radiculopath on the right and left sides. (R. 270-71). Dr. Kelley ordered an X-ray of the cervical spine that revealed the existence of bony neural foraminal encroachment at C3-C4 on the left side (R. 281), and prescribed Lortab, Flexeril, Relafen, and Prednisone. (R. 274).

On July 26, 2010, the claimant went to the emergency room at UAB seeking treatment for back and bilateral hip pain that started when she bent over to pick up litter. (R. 337-49, 364-65, 383-94). The attending physician diagnosed the pain as a low back spasm and noted that the claimant was walking normally. (R. 365).  The attending physician, Dr. Donald A. Reiff, prescribed Percocet for pain relief and discharged the claimant. (R. 348).

On August 17, 2010, the claimant went to the emergency room at UAB seeking treatment for chest and shoulder pain. (R. 350-63, 366-82). The attending physician, Dr. Bobby R. Lewis, ran an electrocardiogram (ECG), which was abnormal. Myocardial Perfusion Imaging revealed that the claimant's heart function was normal. (R. 354-56). The claimant received Toradol for her shoulder pain, stated she felt better, and was discharged that day. (R. 367).

On December 10, 2010, Dr. Oliver Harper evaluated the claimant.[5] In his evaluation, Dr. Harper stated that the claimant did not have a regular doctor. Dr. Harper noted that the claimant suffered from hypothyroidism, degenerative disc disease, Chronic Obstructive Pulmonary Disease (COPD), and asthmatic bronchitis, but that she had not been taking medications for years. In his report, Dr. Harper also noted that the claimant had a good range of motion. He also stated that the claimant admitted to some shortness of breath on exertion after walking three blocks. Dr. Harper concluded that the claimant's degenerative disc disease was basically stable, prescribed Synthroid for the claimant's hypothyroidism, and encouraged the claimant to stop smoking. (R. 396-400).

On February 19, 2011, the claimant was admitted to the UAB Emergency room with complaints of numbness and drooping on the right side of her face. (R.401). The attending physician, Dr. Jarred J. Thomas, ultimately determined that the claimant was suffering from Bell's Palsy and that it may have been caused by her recent cold. The attending physician recommended that the claimant follow up with a neurologist. (R. 408-15). The claimant also underwent a number of tests, including neurological scans and blood work on February 19, 2011. (R.424-74). Dr. Charles Joseph Nunez ordered the scans and radiologist, Dr. Surjith Vattoth, interpreted them. In their notes, Dr. Nunez and Dr. Vattoth indicated that a "tiny aneurysm could not be excluded." Dr. Vattoth recommended that if symptoms persisted, the claimant should return for an MRI. (R. 448-49).

On March 28, 2011, ten days after the ALJ's decision, Dr. Harper wrote a letter stating that the claimant is unable to participate in "meaningful employment" because she suffers from "severe degenerative disc disease." (R. 475).

---

[5]The record does not clearly indicate who requested the evaluation.

11

On June 22, 2011, Dr. Harper, who the claimant indicated previously treated her, also completed a Physical Capacities Evaluation (PCE) for the claimant at the request of the claimant's attorney. The PCE indicates that the claimant can only sit and stand for a total of three hours during an eight hour work day and that the claimant should never bend over, stoop, or climb stairs or ladders. Despite these limitations, Dr. Harper's report indicated that the claimant is able to occasionally lift ten pounds and make pushing and pulling motions, and to walk without an assistive device and operate a motor vehicle. (R. 476).

Dr. Harper also completed a Clinical Assessment of Pain on June 22, 2011 at the request of the claimant's attorneys. In this evaluation, Dr. Harper analyzed how pain would affect the claimant's work capacity. Dr. Harper stated that the claimant's pain would distract her from her daily work and would increase with prolonged sitting, standing, walking, etc. to such an extent that it would cause distraction from or total abandonment of tasks. Dr. Harper determined that the claimant had an underlying medical condition consistent with the pain she experienced. Dr. Harper also determined that the claimant's fatigue and weakness was present to such a degree that it would negatively affect the claimant's adequate performance of daily activities or work. Dr. Harper indicated that physical activities would increase the claimant's level of fatigue and weakness to such a degree that it would cause total abandonment of tasks. Dr. Harper also indicated that medications to ease the claimant's pain would have severe side effects that would cause the claimant to be distracted, inattentive, and drowsy. Dr. Harper stated that these side effects would limit the claimant's effectiveness. (R. 477-78).

*The ALJ Hearing*

After the Commissioner denied the claimant's request for supplemental security income, the claimant requested and received a hearing with an ALJ via video conferencing on March 2,

2011. The claimant appeared in Gadsden, Alabama, and the ALJ presided from Birmingham, Alabama. (R. 17).

At the hearing, the claimant testified that she and her husband were living in her brother's mobile home. She testified that she worked part-time at a dry cleaning store named Village Cleaners seventeen or eighteen years ago, but had not worked since then. (R. 40-43).  She also stated that her husband had been out of work for seven years. (R. 47). She testified that she did not complete the seventh grade and had no GED. (R. 40).

The claimant testified that she suffers from degenerative disc disease and status post lumbar laminectomy that cause her severe back pain. (R. 36-37). She testified that she also suffers from COPD and hypothyroidism and gets nervous in public. (R. 45). She testified that the back pain is her biggest ailment. (R. 37).

The claimant testified that roughly fifteen years ago she experienced pain in her lower back that made her hip and leg go numb. She testified that she had back surgery to correct the problem about fifteen years ago. The claimant also testified that at the time of the hearing she still was experiencing pain in her lower back that radiated through her right hip and leg. (R. 39-40).

The claimant testified that, because of this pain, she cannot sit still or walk for long periods of time. For example, she testified that when she goes to church, she cannot sit through an entire service. Instead, she must get up, move around, and then sit back down. She also testified that she can only stand up for about a minute or two and can only walk about half of a block before she needs to rest. She testified that she is able to vacuum, sweep, mop, and wash dishes, but after five or ten minutes of doing those activities she has to stop and rest for about twenty minutes. At the hearing she estimated that between 8:00 AM and 5:00 PM she spends about three hours in a recliner. (R. 40-46).

13

The claimant also testified that she has difficulty sleeping at night because her back pain forces her to sleep sitting up in a recliner. The claimant stated that she could not lie in the recliner for more than fifteen or twenty minutes without having to get up and move around. The claimant testified that at most she gets three hours of sleep a night. (R. 40-41).

When asked to rate her pain on a scale of zero to ten, with one being very little pain and ten being extreme pain, the claimant testified that on a bad day, her pain is an eight or a nine. The claimant stated that on a good day, her pain goes as low as a four or a five. The claimant testified that she has four or five bad days a week. (R. 44-45). The claimant testified that when her pain is at an eight or a nine, she has difficulty staying focused. (R. 49).

At the hearing, the claimant stated that she was not taking any prescription medications for her back pain because she could not afford any. (R. 42). The ALJ asked the claimant what she had done to get pain medications and whether the claimant had gone to any medical clinics that only require patients to pay what they are able. The claimant responded that she had filled out charity service paperwork at Walker Baptist and UAB. (R. 48). The claimant testified that she usually takes over-the-counter medications to help her back pain, but they do not provide relief. (R. 42). She testified that hot showers can help relieve the pain for about an hour or two. (R. 46). She also testified that she sometimes goes to the emergency room to get treatment for her back pain. (R. 49).

After the claimant's testimony, James A. Hare testified as a vocational expert. Mr. Hare testified that the claimant did not have any past work that rises to substantial gainful activity (SGA). (R. 50).

The ALJ asked Mr. Hare to assume the claimant had no past work experience; could occasionally lift and carry twenty pounds; could frequently lift and carry ten pounds; could stand and walk six hours in an eight hour day and sit approximately six hours in an eight hour day;

could occasionally balance, stoop, kneel, crouch, crawl, and climb ramps and stairs; and that she had breathing problems.  The ALJ then asked Mr. Hare to evaluate, taking the assumed limitations into account, whether any jobs existed that a person of the claimant's age, education, and work experience could perform. Mr. Hare testified that the claimant could work as a silverware wrapper, cafeteria attendant, or an ironer. (R. 50-51).

According to Mr. Hare's testimony, silverware wrapper is a light, unskilled, level one job. Mr. Hare testified that 2,000 silverware wrapper jobs exist in Alabama and 500,000 exist nationwide.  He stated that the claimant could work as a cafeteria attendant because it is a light, unskilled, level two job. Mr. Hare testified that 1,000 cafeteria attendant jobs exist in Alabama and 75,000 exist nationwide. He testified that domestic ironers work in someone's home and that such a job is a light, unskilled level two job. Mr. Hare stated that 10,000 ironer positions exist in Alabama and 900,000 exist nationwide. (R. 51).

When the ALJ asked Mr. Hare if he was familiar with how pain is applied to the employment determination, Mr. Hare testified that he was familiar. Mr. Hare testified that pain rated zero to six on the zero to ten pain scale is considered mild to moderate pain. According to Mr. Hare, that type "of pain may interfere with work but it would not prevent one from working." Mr. Hare testified that pain above a seven on the pain scale is considered moderately severe to severe. Mr. Hare testified that moderately severe to severe pain can preclude work. He also testified that if someone would "not be able to maintain concentration or not be able to maintain persistence and pace for a period of two hours or more per work day" that it would prevent them from working. (R. 51-53).

The ALJ concluded the hearing by asking the claimant if December 10, 2010 was the first time she had visited Dr. Oliver Harper. The claimant answered that she had seen him in the past,

but had not seen him for several years, before she resumed seeing him in December of 2010. (R. 53-54).

*The ALJ's Decision*

On March 18, 2011, the ALJ issued a decision stating that the claimant was not disabled under section 1614(a)(3)(A) of the Social Security Act. (R. 25). First, the ALJ found that the claimant had not participated in substantial gainful activity since June 18, 2009, the date of the claimant's application. Next, the ALJ found that the claimant suffers from degenerative disc disease, status post lumbar laminectomy; hypothyroid; and chronic obstructive pulmonary disease, which are severe impairments that have lasted for more than twelve months. The ALJ found that these "impairments cause more than minimal functional limitations on the claimant's ability to perform work-related duties on a sustained basis." (R. 19).

The ALJ determined that the claimant's depression and anxiety were non-severe. The ALJ based this decision on the fact that the claimant had not pursued treatment since being diagnosed with depression and anxiety and placed on Paxil by a Dr. Ashley several years ago.[6] The ALJ also indicated that the claimant did not list mental health issues on her application for supplemental security income. (R. 19).

Next, the ALJ determined that the claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 C.F.R. part 404, Subpart P, Appendix 1 (20 C.F.R. 416.920(d), 416.925 and 416.926). (R. 20).

Then, the ALJ concluded that the "claimant has the residual functional capacity to perform light work as defined in 20 C.F.R. 416.967(b) except the claimant can lift and carry 10 pounds

---

[6]Throughout the record plaintiff indicates that a Dr. Ashley is her primary care physician and in his consultative evaluation, Dr. Veluz refers to Dr. Ashley as the doctor who diagnosed patient with depression and prescribed Paxil. However, the record does not contain any documentation of Dr. Ashley's treatment of the claimant.

16

frequently and 20 pounds occasionally; the claimant can stand and walk for 6 hours out of an 8 hour day; the claimant can sit for 6 hours out of an 8 hour day; the claimant should avoid unprotected heights and dangerous or moving machinery; the claimant can occasionally kneel, balance, stoop, crouch, or crawl; and the claimant can occasionally climb stairs." (R.20).

In making this decision, the ALJ followed a two-step process. First the ALJ determined whether the claimant suffered from "underlying medically determinable physical impairments . . . that could reasonably be expected to produce the claimant's pain or other symptoms." Then the ALJ evaluated the "intensity, persistence, and limiting effects of the claimant's symptoms to determine the extent to which they limit the claimant's functioning." To evaluate the second step, the ALJ looked first for objective medical evidence. If no objective medical evidence was available, the ALJ evaluated the severity of the claimant's pain "on the credibility of the statements based on a consideration of the entire case record." (R. 21).

The ALJ concluded that no evidence existed that the claimant's depression and anxiety limited the claimant's ability to work. The ALJ determined that the claimant suffered from back pain beginning in 1994 and that the claimant had sought treatment at emergency rooms several times since having back surgery in 1995.  The ALJ found that the consultative physician's indication that "the claimant had no problems getting on and off the examination table" outweighed evidence that the plaintiff was limited in her ability to move. (R. 21). The ALJ also determined that the claimant's hypothyroidism did not limit the claimant's ability to work because the record contained no evidence about a limitation. When the ALJ evaluated the claimant's COPD, the ALJ noted that the claimant did not mention COPD in her medical examinations, but instead, attributed her shortness of breath to chronic bronchitis. The ALJ did find that the claimant suffered from shortness of breath and, therefore, "should avoid concentrated exposure to cold, heat, dust, gases, odors and chemicals." The ALJ also concluded

17

that the claimant should not work around unprotected heights and dangerous moving machinery. (R. 22).

The ALJ noted that the claimant testified she was unable to afford medication, but determined that the claimant lacked credibility because she "has made no effort to secure narcotic pain medication on a consistent basis and continues to smoke."(R. 22). The ALJ also found that the claimant lacks credibility because she is able to do daily activities like cook, clean, watch TV, and go to church. The ALJ stated that because "the claimant has never worked at the level of substantial gainful activity raises some questions as to whether the current unemployment is truly the result of medical problems." (R. 22-23).

The ALJ concluded that the claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms, but that the claimant's statements about the intensity, persistence, and limiting effects of the symptoms were not credible to the extent that they were inconsistent with the RFC. (R. 23).

Next, the ALJ evaluated the opinion evidence. (R. 23). The ALJ stated that he gave significant weight to Dr. Estock's evaluation of the claimant that indicated that the claimant's mental issues were not severe and that the claimant's statements were partially credible. (R. 23; R. 258). The ALJ found that Dr. Estock's assessment was supported by the medical evidence of record. The ALJ stated that "[t]he opinion of the state agency examiner as set out in the Physical Residual Functional Capacity Assessment . . . has not been given any weight as it is an adjudicatory document only and is therefore not considered to be evidence." (R. 23).

Next, the ALJ determined that the claimant had no past relevant work. The ALJ also determined that the claimant was a younger individual (age 18-49) because the claimant was 44 at the time the claimant filed her application. Then, the ALJ determined that the claimant had a marginal education and is able to communicate in English. (R. 23-24).

The ALJ then concluded that, based on the claimant's age, education, work experience, and RFC, jobs exist in significant numbers in the national economy that the claimant can perform. The ALJ noted that the claimant's ability to perform the full range of light work was limited, but that the claimant could still perform the requirements of representative occupations. Based on the testimony of the vocational expert, Mr. Hare, the ALJ concluded that the claimant was not disabled. (R. 23-24).

Finally, the ALJ determined that the claimant has not been under disability, as defined in the Social Security Act, since June 18, 2009, the date the claimant filed the application. (R. 25).

The Appeals Council accepted a brief from the claimant's representative, the February 19, 2011 UAB medical records, the March 28, 2011 letter from Dr. Harper, and Dr. Harper's June 22, 2011 evaluations into the record. (R. 4).

## VI. DISCUSSION

*The Appeal's Council erred when it failed to remand the decision to the ALJ after inadequately reviewing the claimant's newly submitted evidence.*

The claimant argues that the Appeals Council erred when it accepted, but refused to consider, the claimant's newly submitted evidence and did not remand the decision to the ALJ.

Under sentence four of § 405(g), a reviewing court can remand if the Appeals Council failed to adequately consider evidence submitted to it after the ALJ rendered his decision but before the Appeals Council denied review of the ALJ's decision. *Falge*, 150 F.3d at 1323; *Ingram*, 496 F.3d at 1262. The standard of review for new evidence submitted to the Appeals Council is to determine whether, in light of the new evidence before the Appeals Council, a possible basis for changing the ALJ's decision existed. *See Falge*, 150 F.3d at 1324 (explaining that the Appeals Council must consider new and material evidence accepted onto the record when the Appeals Council makes its decision). Remand is justified when (1) new, non-cumulative evidence exists;

19

(2) the evidence is material such that reasonable possibility exists that the new evidence would change administrative result; and (3) good cause exists for applicant's failure to submit evidence at appropriate administrative level. *Vega*, 265 F.3d at 1218. If medical evidence is merely conclusory and not based on, or supported by, objective evidence, the Appeals Council is empowered to discount it. *Crawford*, 363 F.3d at 1159; *Edwards*, 937 F.2d at 583.

On March 28, 2011, ten days after the ALJ's decision, Dr. Harper wrote a letter stating that the claimant was disabled from any work. (R. 475). The Appeals Council accepted the letter into evidence, but did not consider it sufficient for reversal of the ALJ's decision. (R. 1). As this letter merely states that the claimant is disabled from any work without stating an objective reason for the conclusion, this court finds that the letter is conclusory and that the Appeals Council properly determined that Dr. Harper's letter was not grounds for review of the ALJ's decision.

The new evidence most concerning to the court is the PCE that Dr. Harper submitted on June 22, 2011, three months after the ALJ's decision. (R. 476-480). Because Dr. Harper's analysis was not before the ALJ to consider and the Appeals Council accepted it into the record, the court must evaluate Dr. Harper's analysis to determine if the Appeals Council denial of benefits was erroneous. *See Ingram*, 496 F.3d at 1262 (finding that "when a claimant properly presents new evidence to the Appeals Council, a reviewing court must consider whether that new evidence renders the denial of benefits erroneous").

To determine if the Appeals Council acted erroneously when evaluating Dr. Harper's evaluations, this court must determine if Dr. Harper's evaluations are (1) new, non-cumulative evidence, (2) material such that a reasonable possibility exists that the new evidence would change the administrative result, and (3) good cause exists for failure to timely submit Dr.

20

Harper's evaluations. *See Vega*, 265 F.3d at 1218 (finding that remand is justified when the claimant proves these three elements).

This court finds that Dr. Harper's PCE meets the three requirements for remand. Once the claimant submitted Dr. Harper's PCE, the Appeals Council should have remanded the decision to the ALJ.

The PCE meets the first requirement of *Vega* because Dr. Harper's evaluation pertained to the time before the ALJ's decision, but was not in the record at the time of the ALJ's decision. The claimant also has good cause for not putting Dr. Harper's PCE in the record because the evaluation was not in existence at the time of the ALJ's decision. Dr. Harper began treating the claimant on December 10, 2010, only a few months before the ALJ hearing. The length of time between Dr. Harper's initial examination of the claimant in December 2010 and his PCE of the claimant on June 22, 2011 allowed Dr. Harper to continue treating the patient and to more accurately assess the claimant's pain and abilities. This level of extended observation and evaluation would not have been possible before the ALJ hearing because Dr. Harper had only been treating the patient for a few months when the ALJ hearing occurred.  Because Dr. Harper could not have completed the PCE before the ALJ hearing in March 2011, the claimant had good cause for not submitting Dr. Harper's PCE until after the ALJ hearing.

Dr. Harper's PCE is material because it creates the reasonable possibility that the ALJ would have changed his decision if he had had access to the PCE. The PCE creates this possibility because it is supported by other evidence in the record and directly contradicts the RFC assessment. The ALJ based the majority of his conclusion and the hypothetical he posed to the vocational expert on the notion that the claimant had the RFC to perform light work, "except the claimant can lift and carry 10 pounds frequently and 20 pounds occasionally; the claimant can stand and walk for 6 hours out of an 8 hour day; the claimant can sit for 6 hours out of an 8 hour

21

day; the claimant should avoid concentrated exposure to cold, heat, dust, gases, odors, or chemicals; the claimant should avoid unprotected heights and dangerous or moving machinery; the claimant can occasionally kneel, balance, stoop, crouch, or crawl; and the occasionally climb stairs." (R. 20). However, this analysis of the claimant's abilities is only found in the RFC analysis conducted by Ms. Hood to which the ALJ later stated he gave no weight in making his decision. The ALJ reasoned that the RFC assessment should not be given any weight because it "is an adjudicatory document only and is therefore not considered to be evidence." (R. 23). No other medical evidence in the record supports the conclusion that the claimant is able to "stand and walk for 6 hours out of an 8 hour day; . . . sit for 6 hours out of an 8 hour day; . . . occasionally kneel, balance, stoop, crouch, or crawl; . . . [or] occasionally climb stairs." (R. 20).

In fact, all of the other medical evidence indicates that the claimant's abilities are more limited. For example, Dr. Veluz's concluded that the claimant "can sit no longer than five minutes, stand no longer than five minutes, and cannot walk further than sixty feet." (R. 240). Though an ALJ is entitled to disregard medical opinions, he must do so explicitly and explain why he disregarded the opinion. *See Sharfarz v. Bowen*, 825 F.2d 278, 279 (11th Cir. 1987) (finding that reversible error exists when an ALJ fails to state with particularity the weight given to different medical opinions and the reasons therefor); *see also MacGregor v. Bowen*, 786 F.2d 1050, 1053 (11th Cir. 1986) (finding that the secretary's failure to state and explain the explicit weight he gave to medical testimony is reversible error). The ALJ stated that he dismissed Dr. Veluz's conclusions because Dr. Veluz noted that the claimant had no trouble getting on and off the table. However, the fact that the claimant was able to get on and off of an examination table neither affects nor indicates the claimant's ability to sit, stand, or walk for any length of time. The new evidence submitted to the Appeals Council, Dr. Harper's PCE, supports Dr. Veluz's conclusion that the claimant is more limited than the ALJ's RFC determination of the claimant.

Dr. Harper concluded that the claimant only is able to sit and stand for a total of three hours during an eight-hour workday. Dr. Harper also determined that the claimant should never bend over, stoop, or climb stairs or ladders. (R. 476).

If the ALJ had seen Dr. Harper's PCE before making his decision, the ALJ would have had two doctors stating that the claimant was more limited than the RFC and only one piece of evidence, the RFC assessment to which the ALJ explicitly gave no weight, stating the claimant could "stand and walk for 6 hours out of an 8 hour day; . . . sit for 6 hours out of an 8 hour day; . . . occasionally kneel, balance, stoop, crouch, or crawl; . . . [or] occasionally climb stairs." (R. 20). Because the ALJ stated he gave no weight to the RFC assessment *and* no other medical evidence supports the ALJ's RFC, two doctors stating that the claimant is more limited than the RFC reasonably might have altered the ALJ's decision, or at least altered the hypothetical the ALJ posed to Mr. Hare, the vocational expert. Because Dr. Harper's PCE is new evidence that created the reasonable possibility that the ALJ might have changed his decision, and the claimant had good cause for not submitting it to the ALJ before his decision, the Appeals Council should have remanded the decision to the ALJ to consider the record as a whole. Thus, the Appeals Council erred when it failed to remand the case because a reasonable possibility existed that Dr. Harper's PCE might have changed the outcome.

*Other Concerns*

On remand, the ALJ should address additional concerns of this court. The court notes that an additional reversible error exists because the ALJ failed to articulate the weight he gave to Dr. Veluz's consultative evaluation. ALJ's are required to clearly assign a weight to given testimony. When an ALJ fails to clearly and explicitly state the weight given testimony, a reversal is mandated. *See Sharfarz*, 825 F.2d at 281 (finding that a decision must be remanded when the ALJ provided no cause for not according the examining, treating physicians

considerable weight and according non-examining, non-treating physicians significant weight); *see also MacGregor*, 786 F.2d at 1053 (finding that the secretary's failure to state and explain the explicit weight he gave to medical testimony is reversible error).

In his decision, the ALJ failed to clearly establish the weight he gave to Dr. Veluz's testimony. The ALJ noted that Dr. Veluz performed a consultative examination and dismissed all of Dr. Veluz's conclusions based on one note that stated the claimant was able to get on and off of the examination table without difficulty. However, the ALJ did not address Dr. Veluz's conclusions that directly contradicted the RFC assessment performed by Ms. Hood. The ALJ also did not address  Dr. Veluz's conclusions that directly contradicted the ALJ's determination of the claimant's RFC. As a result, the ALJ did not assign a clear weight to Dr. Veluz's testimony, which constitutes reversible error.

The court is also concerned about the manner in which the ALJ addressed the claimant's inability to pay for medication. The ALJ determined that the claimant was not credible because she "ha[d] made no effort to secure narcotic pain medication on a consistent basis and continue[d] to smoke." (R. 22). However, at the hearing, the claimant testified that she had not purchased pain medication because she could not afford any. (R. 42). A claimant's inability to follow prescribed treatment because of the claimant's poverty, however, is not grounds for discrediting the claimant's testimony. Failure to acquire prescribed medication because of poverty also does not bar a claimant from receiving SSI benefits. *Dawkins v. Bowen*, 848 F.2d 1211, 1213-14 (11th Cir. 1988). Thus, even though ALJs can evaluate a claimant's credibility, this court is concerned that the ALJ inappropriately discredited the claimant because of the claimant's inability to afford medication. The ALJ substantially based his decision to discredit the claimant's subjective testimony of pain on non-compliance, but the claimant testified that she was non-compliant because of her inability to pay. On remand, the ALJ should adequately

address whether the claimant's non-compliance was because of the claimant's inability to afford treatment.

## VII. CONCLUSION

For the reasons stated, this court concludes that the decision of the Commissioner is due to be REVERSED and REMANDED.

A separate order will be entered in accordance with this Memorandum Opinion.

DONE and ORDERED this 3rd day of July, 2013.

_____
KARON OWEN BOWDRE
UNITED STATES DISTRICT JUDGE